## LOCAL NO. 1460 OF RETAIL CLERKS UNION ET AL.
### *v.* ROTH

[No. 27,383.   Filed February 24, 1941.   Rehearing denied
March 24, 1941.]

*Faust, Faust & Faust,* of Indianapolis, for appellants.

*Jay E. Darlington* and *Crumpacker & Friedrich,* all of Hammond, for appellee.

FANSLER, J.—This is an appeal from a final judgment enjoining the appellants from picketing the premises of the appellee. The case was here before on an appeal from an interlocutory order granting a temporary injunction. (See *Roth* v. *Local Union No. 1460 of Retail Clerks Union et al.* [1939], 216 Ind. 363, 24 N. E. [2d] 280.)

On the trial of the application for a temporary injunction, the court found the facts specially. Upon the appeal the evidence was not brought before us, and the cause was decided upon the basis of the facts disclosed by the special findings. From the facts shown, it was concluded by this court that the three clerks who worked for Roth in his store were not members of the picketing union at the time the picketing began and at the time demands were made upon him to sign a closed shop agreement; that he had not interfered with the freedom of his employees to join or not to join the union; that he was refusing to interfere or to sign a contract, by the terms of which he agreed to require his clerks to join the union, upon the ground that to do so would require him to violate the expressed statutory public policy of the state (Acts 1933, ch. 12, § 2, p. 28, § 40-502, Burns' 1940 Replacement, § 10156, Baldwin's 1934), which declares that employees "shall be free from interference, restraint, or coercion of employers"; that the purpose of the picketing was to coerce him to violate this declared public policy under penalty of having his business destroyed by the picketing.

Upon the present appeal, the evidence is brought into the record.

The sufficiency of the evidence to sustain the special findings is challenged, and it is asserted by the appellants that there is no evidence to sustain the finding that the signs carried by the pickets "are designed to convey to the public and plaintiff's customers the idea that plaintiff refuses employment to, or discriminates against members of defendants' union, which idea implies representations which are false and in fact operate as a fraud upon plaintiff, his employees and the public." This assertion directed attention to the evidence.

The appellee, as plaintiff below, called as a witness one of his clerks, Dorothy Carlson. She testified that she went to work for Roth, when he opened his store in January, 1939, as a grocery clerk; that she joined the defendant union in March, 1939.; that, before joining, a representative of the union talked to her, and told her that if she refused to join pickets would be put in front of the store, and that she would be out of a job if that was done; that because of this threat she joined the union. She was still a member of the union on the morning of May 17, 1939. On that morning she came to work about 8 o'clock. Shortly after 8 o'clock a representative of the union came to her and told her to go out and picket. She told him that she would not, and he told her it would cost her a $50 fine. Shortly thereafter, at about 8:30 o'clock on the same morning, the picket line was established. The witness did not leave the store until about 11:30 o'clock, when she went out to lunch. She came back at approximately 12:30 o'clock. The picket line was still operating. At about 2:30 o'clock in the afternoon, Roth handed his clerks a letter and told them to read it. This letter was typed, ready for signature, and reads as follows:

"Hammond, Indiana
"May 17, 1939

"Retail Clerks Union,
"Retail Clerks International Protective Association,

"Gentlemen:

"The undersigned hereby resigns from your association and severs all connection with your association and all of your agents, effective immediately. You and all of your agents are forbidden to represent the undersigned in any manner."

She read this letter and signed it. The other two clerks, Wellington A. Barnes and Meyer Kaplan, signed it before her. After she signed it, she gave it back to Roth. On cross-examination, she was asked:

"Q. Had you any intention of resigning from the local union prior to the time you were handed this document? A. Why, I didn't want to belong in the first place.

"Q. Had you any intention of resigning from the local union prior to the time you were handed this document? A. If possible, I would have.

"Q. What do you mean by 'if possible?' A. Well, I could figure no way to get out of the union without having them raise a lot of trouble in the store.

"Q. I see. Did you take it to mean, when Mr. Roth handed you this letter, that he wanted you to sign it? A. Why, I understood that, yes.

"Q. Did you have any information that this letter existed prior to the time Mr. Roth handed it to you?"

There was an objection to the question, and, when it appeared that it might be sustained, the question was withdrawn. She was then asked:

"Q. Had you ever talked to Mr. Roth about this letter before you signed it? A. No, I did not.

"Q. Had you ever talked to Mr. Roth about the possibility of resigning from the union before you signed this letter?"

There was an objection to this question, which was not answered. Then the court said:

"Well, I will ask the young woman. In fact, I presume you are not a typist. Do you use a typewriter? A. No, sir.

"The Court: You did not type this letter yourself, personally? A. No, sir.

"The Court: She said she did not write the letter."

She was then asked:

"Q. Was this document typed at your direction?"

There was an objection, and, after some discussion, the question was withdrawn.

In the discussion of counsel concerning objections to these various questions, counsel for the defendants said: "We should like to know if she had any information about it beforehand." The court inquired: "Why? What is the materiality of that?" And the defendants' counsel replied: "For the reason, if the court please, it may be this thing was talked over prior to the time this lady signed." Counsel for the plaintiff said: "Of course it was talked over." Defendants' counsel said: "If it was, I would like to know what the conversation was."

The rulings on the objections to these questions are not assigned as error. They are referred to, to show that the examination of this employee, seeking to disclose the origin of the letter of resignation from the union, and by whom it was inspired, was unduly curtailed. The witness was brought forward by the plain-

tiff, Roth, who did not take the stand and deny any of her testimony. The other two clerks were not called as witnesses.

After the letter was signed and delivered to Roth, it was mailed to:

"Retail Clerks Union,

"Retail Clerks International Protective Assn.,

"Indiana Hotel Bldg.,

"Hammond, Ind."

by registered mail. The envelope bore the following names and return address on the upper lefthand corner:

"W. A. Barnes

"Meyer Kaplan

"Dorothy Carlson

"5823 Calumet Ave.

"Hammond, Ind."

It is clear from this undisputed evidence that at the time the union demanded that Roth sign a closed shop contract, and at the time the picketing began, all of Roth's clerks were members of the picketing union, and continued to be members for at least several hours thereafter; that Dorothy Carlson, and, it may be inferred, the other two clerks, never saw the letter of resignation until it was handed to them by Roth; that she at least, and probably the other two, had not planned to resign until presented with the document. When it is considered that the signers of the letter were grocery clerks in a small grocery, the language of the letter and its construction clearly indicate that it must have been prepared by some one else. It clearly indicates that Roth's employees were not "free from interference," as the public policy statute upon which he relies requires that they should be. Nor can it be confidently said that they were free from coercion. They understood that Roth wanted them

to sign the letter. A request sometimes has the force of a command. Failure to comply with an employer's request may mean loss of employment. This undoubtedly is the reason for the statutory provision that employees shall be free from interference in matters affecting their joining or refusing to join labor organizations.

These facts establish a case differing substantially and materially from the one disclosed by the special findings. From the special findings it appears to be a case in which a labor union seeks, by picketing, to coerce an employer to require his employees who are not members of the union to join the union upon penalty of being discharged. But it is not such a case. At the time the picketing began its purpose was to coerce an employer, all of whose employees were members of the picketing union, to agree that in the future he would employ only union members. The right to an injunction under such circumstances was denied in *Scofes et al.* v. *Helmar et al.* (1933), 205 Ind. 596, 187 N. E. 662. By the time the case was tried the situation had changed. The employer had interfered and aided and encouraged his employees to sever their connection with the union. This conduct is a violation of the very public policy statute which the appellee relies upon as entitling him to an injunction. He says in substance: "Being a law-abiding citizen, I refuse to interfere or coerce my employees to join a union to which they do not belong. The law forbids that I do so. Therefore it is unlawful for this union to seek to coerce me to violate the law by picketing me as unfair to union labor. It would be unfair for me to interfere or coerce my employees." But the fact is that he has not been law-abiding with respect to the statute. He has interfered and intermeddled; he has encouraged, if not coerced,

his employees, which conduct is a violation of the statute upon which he relies for protection against picketing. Under the public policy declared by that statute, he has been unfair, and the banner carried by the picket speaks the truth. He may not insist that the appellants be required to conform to a public policy to which he, himself, refuses to conform.

Appellants' objection to the special findings was sufficient to direct our attention to the evidence. The objection was vague and did not point specifically to the testimony of Dorothy Carlson, but the true facts being disclosed by our examination of the evidence, we may not ignore them. The appellee was the plaintiff, seeking the aid of a court of equity. He had the burden of establishing facts which entitled him to injunctive relief. The testimony of his own witness discloses that he is not entitled to an injunction. The special findings do not reflect the true situation. They are not supported by the evidence.

Judgment reversed, with instructions to dissolve the injunction and to grant appellants' motion for a new trial.

Richman, J., not participating.

NOTE.—Reported in 31 N. E. (2d) 986.